IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION


FRANK B. MCCUNE, JR.                                    PLAINTIFF

VS.                     CIVIL ACTION NO. 3:11-cv-423(DCB)(MTP)

UNITED STATES DEPARTMENT OF JUSTICE and
OFFICE OF UNITED STATES ATTORNEY GENERAL,
SOUTHERN DISTRICT OF MISSISSIPPI                       DEFENDANTS


<u>MEMORANDUM OPINION AND ORDER</u>

This cause is before the Court on the Motion for Summary Judgment **(docket entry 313)** filed by the defendants United States Department of Justice and Office of the United States Attorney General for the Southern District of Mississippi (hereafter collectively referred to as "the DOJ" in the singular); and the plaintiff Frank B. McCune, Jr. ("Dr. McCune")'s Motion for Partial Summary Judgment **(docket entry 317)**. Having carefully considered the motions and responses, the memoranda of the parties and the applicable law, and being fully advised in the premises, the Court finds as follows:

Dr. McCune filed the instant action alleging four (4) violations of the Right to Financial Privacy Act for failure to provide notice of disclosure of financial records under 12 U.S.C. § 3417. The DOJ submits that it is entitled to summary judgment as there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. Specifically, the DOJ contends that Dr. McCune's claims are barred by the three (3) year statute of

limitations.   In the alternative, the DOJ contends that it is entitled to partial summary judgment: First, as to two (2) of the four (4) subpoenas at issue, the DOJ asserts that Dr. McCune cannot establish that his personal bank records were produced or disclosed; Second, the DOJ asserts that it is entitled to partial summary judgment on any claims for actual damages because Dr. McCune cannot establish a causal connection.   Finally, the DOJ asserts that it is entitled to partial summary judgment on any claim for punitive damages because Dr. McCune cannot establish willfulness.

Dr. Frank McCune owned and operated several health care businesses in the 1980's and 1990's.  Among the businesses he owned were two home health agencies.  Both agencies had separate Medicare provider numbers under the name "Serve-U Home Health" ("Serve-U"), although the Jackson location operated under the name "Domicile, Inc." ("Domicile"), and the Natchez location operated under the name "Serve-U-Home Health Out-Patient and Rehabilitation Services, Inc." ("Serve-U Rehab").   Both Serve-U Rehab and Domicile were managed by Neo-Ventures Enterprises, Inc. ("Neo-Ventures"), another company owned by Dr. McCune.   Neo-Ventures represented the home office of these home health agencies.

Dr. McCune's wife, Ellen McCune, also worked with these businesses.  She signed the cost reports for the Medicare entities and the Neo-Ventures home office.  She was also the fiduciary for

the companies' pension plan.

Based on complaints, Dr. McCune and his businesses came under investigation in the late 1990's.  One of the investigations, a criminal investigation by the Department of Health and Human Services Office of Inspector General ("HHS"), led to Dr. McCune's indictment.

On December 15, 1997, HHS received a complaint or tip from an informant regarding allegations of home health agency fraud by Dr. McCune, Ellen McCune, and their businesses, Neo Ventures and Serve-U, which consisted of Serve-U Rehab and Domicile (hereinafter collectively referred to as "the McCunes").  Melear Decl. ¶ 2, Def. Ex. A.

The informant made a number of allegations, including: (1) the McCunes improperly received reimbursement from Medicare for a Department of Labor ("DOL") fine that was levied against Serve-U; (2) the McCunes improperly received reimbursement from Medicare in the sum of $275,000 for a computer system that was never purchased by Serve-U; (3) employees were not receiving contributions to their pension plans; (4) the McCunes improperly received reimbursement from Medicare for trips to Aruba and Hawaii for the McCunes' employees and Dr. McCune's family members.  Id.  When HHS received the complaint, it did not have an office in Jackson, Mississippi.  Melear Dep. 199:19-22, Def. Ex. B.  The complaint was forwarded to the fiscal intermediary, which was Palmetto Government Benefits

3

Administrators ("Palmetto GBA"), for investigation, and the case was closed with HHS.  Id.

In the early part of 1998, HHS opened an office in Jackson, Mississippi.  Melear Dep. 200:3-7.  Special Agent Lynn Townsend (now Lynn Melear) was hired to investigate health care fraud involving federal government benefits.  Melear Decl. ¶ 1.  The case involving the McCunes was one of the cases Special Agent Melear received.  Id.

On or about July 9, 1998, Melear contacted Lori Dion with Palmetto GBA to discuss the allegations of cost report fraud[1] by the McCunes.  Id. at ¶ 3.  Ms. Dion, an auditor, noted that no field audit of Serve-U had been conducted since 1989.  Id.  She also noted that a desk audit of 1997 cost reports was scheduled for fiscal year (FY) 1999, which started July 1, 1998, and went through June 30, 1999.  Id.  Melear also discussed some of the allegations against the McCunes and the circumstances under which costs are allowable.  Id.  Melear reopened HHS's case on the McCunes on or about August 24, 1998, and began an investigation of the matter. Id. at ¶ 4.  She interviewed a number of individuals over the course of the next several years, including Dr. and Mrs. McCune.

---

[1] For a period of time, Home Health Agencies were reimbursed for expenses incurred that were connected with the care provided Medicare beneficiaries, based on the costs submitted on a document known as a "cost report."  Medicare reimbursed Home Health Agencies at 100% of reimbursable expenses claimed on the cost report.  As  discussed below, the method of paying home health agencies changed after the Balanced Budget Act of 1997.

As discussed below, the investigation culminated in an indictment of Dr. and Mrs. McCune. Id. The Office of the United States Attorney for the Southern District of Mississippi ("USAO") also issued a number of subpoenas pursuant to its authority under 18 U.S.C. § 3486, which authorizes the issuance of administrative subpoenas to investigate, inter alia, federal health care offenses. The record indicates that the USAO issued subpoenas to Union Planters Bank, Industrial Employees Credit Union (now Members Exchange Credit Union ("MECU")), and Merchant and Farmers Bank ("M&F") on January 25, 1999, for financial records belonging to Dr. McCune, Mrs. McCune, Serve-U, Neo-Ventures and Domicile. Union Planters Subpoena, Def. Ex. C; MECU Subpoena, Def. Ex. D; M&F Subpoena, Def. Ex. E. On the same day, the USAO issued a subpoena to Mrs. McCune for, among other things, banking statements, American Express statements, and gas credit card statements for the Serve-U home health agencies and Neo-Ventures. Ellen McCune Subpoena, Def. Ex. F. Also, on June 23, 1999, the USAO issued a subpoena to a travel agency for travel documents related to the McCunes. Travel Subpoena, Def. Ex. G.

In November of 2001, the USAO also drafted a subpoena dated November 7, 2001, to Dr. Frank McCune as the custodian of records for Neo-Ventures and Serve-U as well as American Express Financial Services (now Ameriprise). Ameriprise Subpoena, Def. Ex. H. There is no indication as to whether these subpoenas were actually

served.  The subpoena that was drafted for Ameriprise requested any and all documentation related to any accounts owned directly or indirectly by, among others, Dr. McCune and Neo-Ventures, Inc.

As previously mentioned, HHS forwarded the complaint it received in December of 1997 to the fiscal intermediary, Palmetto GBA.  The complaint would have come through Palmetto GBA's fraud/integrity unit to the Audit Division, which was supervised by Lori Dion for investigation.[2]  Dion Decl. ¶ 2, Def. Ex. I.

On June 16, 1998, within six months of the referral to Palmetto GBA, Palmetto GBA selected Serve-U Rehab and Domicile for desk reviews of their respective FY 1997 cost reports.  Dion Decl. at ¶ 3.  Palmetto GBA requested information from the McCunes related to the companies' accruals including the pension plan.  Id.

The items requested with respect to the focused desk review were all items that would be requested in any focused desk review, except that the review of Serve-U Rehab also requested information related to leases.  Id.  The focused reviews concluded on June 28, 1999.  Id.  These reviews resulted in a notice of overpayment of $291,706 with respect to Serve-U Rehab, and $825,052 with respect

---

[2] With respect to Palmetto GBA and its work, they were only concerned with the two home health agencies, Serve-U Rehab and Domicile, and their home office, Neo-Ventures.  Both of the home health agencies had their own Medicare provider numbers.  Domicile's Medicare provider number was 25-7130, and Serve-U Rehab's Medicare provider number was 25-7310.  The home office Neo-Ventures also submitted a cost report, and was subject to audit.

to Domicile.  <u>Id</u>.  The reviews found that there were unsupported accrued expenses including vacation, mileage and pension as well as unsupported professional fees.  <u>Id</u>.

The McCunes were notified of the results of the focused reviews on December 29, 1999, in two separate letters, one for each institution.  <u>Id</u>.  The home office also was selected for a full desk review on July 13, 1998, for review of its FY 1997 cost report.  Dion Decl. ¶ 4.  The review of the home office lasted until July 8, 1999, and was followed by a full audit from July 12, 1999, to July 30, 1999.  <u>Id</u>.  Serve-U Rehab and Domicile were also selected for desk review on December 18, 1998, for a review of their respective FY 1998 cost reports.  Dion Decl. ¶ 5.  These reviews were completed on May 30, 2000.  <u>Id</u>.  The review of Domicile resulted in an overpayment of $427,386, and the review of Serve-U Rehab resulted in an overpayment of $21,083.  <u>Id</u>.  The McCunes were notified of these overpayments in separate letters dated September 30, 2000.  <u>Id</u>.

Lori Dion unequivocally testified that she did not consider Dr. McCune's personal financial records in any of the audits and desk reviews conducted by her division and under her supervision. Dion Dep. 126:9-128:3, Def. Ex. U.  She testified that "[t]here was no need, in the course of the Medicare audit, to review personal banking records."  <u>Id</u>. at 128:2-3.

The DOL's Employee Benefits Security Administration ("EBSA")

7

is charged with assuring the security of the retirement, health and other workplace-related benefits of employees. McConnell Decl. ¶ 1, Def. Ex. J. Among other things, the EBSA conducts civil and criminal investigations regarding employee benefits plans, including matters related to compliance issues and fraudulent activity. Id.

In July of 1998, EBSA began receiving complaints about the handling of the Neo-Ventures' Employee Pension Plan, and by February 24, 1999, EBSA had received six complaints from employees. McConnell Decl. ¶ 2. In July of 1998, an employee reported that the company was having financial difficulty and that there was no distribution. Id. In December of 1998, an employee reported that he or she was terminated in 1996 and still had not received his or her distribution. Id. In January of 1999, three employees complained to ESBA: each had not received distributions he or she was due and reported other irregularities — one employee having completed the distribution paperwork in July 1997, and another in July 1998. Id. On February 24, 1999, another employee reported that he or she did not receive his or her distribution despite having completed his or her paperwork in July of 1998. Id. Based on these complaints,[3] EBSA opened a civil investigation into the

---

[3] EBSA received one additional complaint on March 10, 1999, in which an employee indicated he or she had received statements for the last two quarters and had serious questions or concerns about them. McConnell Decl. ¶ 2. In addition to the complaints regarding the pension plan, ESBA also received complaints about

Neo-Ventures employee benefits plan.  Auditor Niki McConnell was assigned the case.  Id. at ¶ 3.  She opened her case on February 26, 1999.  Id.

Auditor McConnell conducted her investigation on several issues related to the Neo-Ventures pension plan.  One of the key issues the investigation covered was whether Neo-Ventures was contributing monies it had received from Medicare for contribution to the Neo-Ventures employees' pension plan.[4]  McConnell Decl. ¶ 4. For FY 1996, 1997, and 1998, Neo-Ventures, because it was the parent or managing company of the Medicare entities Serve-U Home Health and Domicile, received reimbursement from Medicare for contributions that it claimed it was making to its employees' pension plans.  Id. at ¶ 5.  Neo-Ventures claimed the pension plan contributions as expenses on its home office cost reports.  Id. Medicare regulations required that the company pay the contributions into the employees' pension plans within one year of the end of the fiscal year.  Id.  The McCunes admittedly had not done so.  Auditor McConnell conducted her investigation by requesting and/or subpoenaing a number of documents and

_____

cessation of Neo-Ventures' health care plan in February of 1999 despite the fact that the employees' contributions to the plan were still deducted from their paychecks.  Id.

[4] The investigation also determined that the pension plan failed to timely pay distributions, unreasonably withheld "surrender fees" from the distribution, failed to apply the vesting schedule properly, and failed to maintain a fidelity bond.

interviewing a number of witnesses, including Mrs. McCune who was the pension plan trustee.  McConnell Decl. ¶ 6.  Dr. McCune was also a fiduciary of the pension plan.  Id.  McConnell also consulted with Special Agent Melear regarding how home health agencies and cost reports worked.  McConnell Dep. 31:16-32:6, Def. Ex. K.  McConnell received and considered for her investigation statements related to the pension plan, cost report information, and other documentary evidence.  McConnell Decl. ¶ 6.  McConnell did not receive or consider in her investigation Dr. McCune's personal financial records.  McConnell Dep. 43:8-12, 53:19-24, 55:8-11; McConnell Decl. ¶ 6.

The investigation revealed that Medicare allotted $705,053 in Medicare funds for the pension plan for FY 1996, but the McCunes only paid $100,000 of that money into the pension plan because of cash flow problems.  McConnell Decl. ¶ 7.  In addition, Medicare allotted $229,095 and $220,866 for FY 1997 and FY 1998, respectively, for the pension plan.  Id. at ¶¶ 8-9.  The McCunes paid none of these funds into the pension plan.  Id.  Consequently, at the conclusion of the investigation, the pension plan was due a total of $1,055,014.  Id. at ¶ 10.  The investigation concluded that instead of contributing this amount to the pension plan, the monies were used for day-to-day business operations such as payroll and expenses.  Id. at ¶ 11.  As noted in a letter sent to Ellen McCune, the investigation concluded that the McCunes were in

violation of the fiduciary provisions of ERISA.  <u>Id</u>. at ¶ 12.

Auditor McConnell testified that EBSA took no civil action against the McCunes.  Because the monies had not actually been paid to the plan as required by Medicare, they were not plan assets, and there was no civil remedy where there were no plan assets involved. McConnell Dep. 29:3-30:12; 63:16-24.  However, EBSA did inform the McCunes, in a letter written to Ellen McCune, that EBSA was authorized to forward the results of the investigation to any other government agency that was authorized to take corrective action. McConnell Decl. ¶ 12.  In addition, EBSA informed the McCunes that although EBSA chose not to bring legal action at that time, it could review its decision at a later date.  <u>Id</u>.  Auditor McConnell closed her civil investigation on August 13, 2001.  <u>Id</u>. at ¶ 13.

At some point after her civil investigation was closed, Auditor McConnell was asked to join the investigation by HHS and/or the USAO.  McConnell Dep. 24:15-25:13; McConnell Decl. ¶ 14. Consequently, Auditor McConnell opened a criminal matter on Frank and Ellen McCune on February 4, 2002.  McConnell Decl. ¶ 14.  By that date, Neo-Ventures and the other McCune health care businesses had ceased operation.  The criminal matter was closed on June 11, 2003.  <u>Id</u>.

The investigation's prosecutive summary was presented to the USAO in 2002, and the USAO opened a matter on Neo-Ventures, Dr. McCune and Mrs. McCune in July of 2002.  Dowdy Dep. 20:10-21, Ex.

L.   The prosecutive summary was prepared by Lynn Melear with the assistance of DOL Auditor McConnell (as to the pension plan issues) and Auditor Lori Dion (as to the cost report issues).  Melear Dep. 63:8-64:5.  The prosecutive summary was attached to a memo written by AUSA Anderson and submitted as a part of the Indictment Review Committee (IRC) Memo.  IRC Memo, Ex. M.

The prosecutive summary set forth the evidence that could support an indictment for conspiracy to commit health care fraud, embezzlement from a health care program, and false statements relating to a health care program.  IRC Memo.  The embezzlement charge involved a claim by the government that Medicare paid three McCune businesses (Neo Ventures, Serve-U Rehab and Domicile) $649,069 in reimbursements that the McCunes claimed were paid to the pension fund of these companies for FY 1996 and 1997, when in fact the McCunes only paid $100,000 into the pension funds.  Id. The prosecutive report indicated that Medicare was owed $549,069. Id.   The false statements charge related to reimbursement for expenses claimed on the cost reports for the pension fund and travel expenses as well as the failure to disclose a related party (HSDI, another company owned by Dr. McCune).  Id.  The prosecutive summary contains a detailed list of exhibits used to support the findings of the investigation and charges.  Anderson Dep. 33:19-25, Ex. N; IRC Memo.  Dr. McCune's personal banking records were not used to support the findings of the investigation or the proposed

charges.  Anderson Dep. 39:1-40:5, 80:12-18; IRC Memo.

On or about November 20, 2002, the grand jury issued its indictment.  Indictment, Ex. O.  The grand jury indicted Dr. and Mrs. McCune on one (1) count of conspiracy to commit health care fraud, six (6) counts of making false statements related to submission of their cost reports for FY 1997 and FY 1998, and one (1) count of embezzlement related to the failure to pay the pension funds reimbursed by Medicare into the pension plan.  Id.  There was also one (1) count of forfeiture.  Id.  The indictment does not mention Dr. McCune's personal bank records or finances, and the charges therein were not based on Dr. McCune's personal bank records or finances.  Anderson Dep. 45:13-49:9, 79:1-20, 80:19-25; Melear Dep. 71:6-72:20, 117:12-118:12; Indictment.

On or about January 22, 2003, the grand jury issued a superseding indictment.  Superseding Indictment, Ex. P.  None of the substantive counts of the indictment were materially changed.  Anderson Dep. 62:25-63:18; Superseding Indictment.  However, the superseding indictment listed substitute assets in the general forfeiture count.  Id.  The substitute assets consisted of, among other things, one (1) certificate of deposit ("CD") belonging to Dr. McCune at Merchant & Farmers Bank, and two (2) CDs belonging to Dr. McCune at Members Exchange.  Id.  Dr. McCune testified that he would have been aware of the substitute assets mentioned in the superseding indictment.  McCune Dep. (Vol. II) 109:6-112:9, Ex. Q.

13

See also Anderson Dep. 63:19-64:24.  He also testified that he was aware of a newspaper article that detailed the listing of his bank account information from the superseding indictment.  McCune Dep. (Vol. I) 74:19-75:3, Ex. R.

At the trial of the matter, there were no exhibits introduced that pertained to Dr. McCune's personal financial records. Anderson Dep. 138:25-139:15; Gov't Ex. List, Ex. S.  Dr. McCune has pointed to no testimony at trail regarding his personal financial records.

According to notice provided to Palmetto GBA, Serve-U Rehab ceased operation as a home health agency on July 20, 1999, and Domicile ceased operation as a home health agency on April 1, 2000. Dion Decl. ¶ 6.  Notably, Serve-U Rehab closed before the McCunes were notified of the results of any of the audits or desk reviews as those notices did not occur until December 1999.  The two entities also ceased operation well before the November 2002 indictment.  According to the Mississippi Secretary of State's website, Serve-U Rehab, Domicile and Neo-Ventures were all administratively dissolved on December 28, 2001.  See Serve-U Rehab filings, https://business.sos.state.ms.us/corp/soskb/Filings.asp? 142395; Domicile filings, https:// business. sos. state. ms. us/ corp/soskb/Filings.asp?317853;  Neo-Ventures  filings,  https:// business.sos.state.ms.us/corp/soskb/Filings.asp?169576.

According to Dr. McCune, between 87 % to 95 % of the business

that Domicile and Serve-U Rehab did came from Medicare.   McCune
Dep. (Vol. I) 35:25-36:10.

In 1997, Congress passed the Balanced Budget Act of 1997 (the
"BBA"), which implemented the Interim Payment System ("IPS").   The
United States District Court for the Northern District of Texas set
forth the crux of the IPS:

> Medicare has traditionally reimbursed HHAs pursuant to a
> reasonable cost system which mandated that the HHAs be
> reimbursed for services rendered to Medicare
> beneficiaries in accordance with the reasonable costs
> that they incurred, with the reasonable costs capped by
> a predetermined maximum limit.  However, in an effort to
> control costs and reduce fraud and abuse in the home
> health care system, Congress modified the traditional
> reasonable cost reimbursement method in the BBA.  Pub.L.
> No. 105-33, §§ 4602 & 4603.  Congress directed that,
> effective October 1, 1999, and not later than October 1,
> 2003, HHAs be paid under a Prospective Payment System
> ("PPS") similar to the one utilized for other Medicare
> providers such as hospitals.  Pub.L. No. 105-33, §
> 4603(a), codified at 42 U.S.C. § 1395ff(a),(b).  Until
> that system can be implemented, Congress required HCFA to
> implement an Interim Payment System ("IPS").  Id., § 4602
> codified at 42 U.S.C. § 1395x(v)(1)(L).   Congress
> intended that, in many cases, HHA's total annual payments
> under the IPS for treating the same number of
> beneficiaries as they had before the BBA would be lower
> than before Congress passed the BBA.
>
> Under the IPS, HHAs are to be paid for cost reporting
> periods beginning on or after October 1, 1997, based on
> the lowest of three calculations:
>
> > 1) The HHAs actual reasonable allowable costs;
> >
> > 2) A revised aggregate per-visit limit not to
> > exceed 105% of the median per-visit costs;
> >
> > 3) A new aggregate per-beneficiary limit.
>
> 42 U.S.C. § 1395x(v)(1)(L).

15

_Greater Dallas Home Health Care Alliance v. United States_, 36 F.Supp.2d 765, 766-67 (N.D. Tex. 1999).

Dr. McCune testified that the IPS negatively impacted his business, describing it as "some sort of sequestration." McCune Dep. (Vol. 1) 52:3-20. Dr. McCune agreed with his attorney's statements during the criminal trial that Dr. McCune's businesses were paying $64 to take care of a patient and Medicare was only reimbursing him $55. McCune Dep. (Vol. II) 44:4-45:13.

In her deposition, Lori Dion recollected the BBA had such a severe impact on many home health businesses that they closed or filed for bankruptcy. Dion Dep. 146:10-18. In fact, Palmetto GBA records demonstrate that from 1997 to 1999, the McCune businesses had several rate adjustments that resulted in at least $160,000 in overpayments. Dion Decl. ¶ 8. Lori Dion's audit department had nothing to do with setting the rates of any Medicare entity, including the McCune businesses. _Id_.

In addition to the overpayments caused by the interim rate, the McCune businesses also had overpayments resulting from Medical reviews. Serve-U Rehab underwent an intensive medical review in February of 1999. _Id_. at ¶ 9. The medical review was conducted after Serve-U Rehab rejected a consent settlement offer made to it on October 8, 1998. _Id_. The medical review of randomly selected claims led to a determination that Serve-U Rehab submitted claims for services that were not reasonable and necessary, resulting in

an overpayment of $417,704.00.  Id.  The McCunes were notified of this overpayment in December 1999.  Id.

Also, in March of 1999, Domicile underwent an intense medical review because its billing data demonstrated that it may be billing inappropriately for services.  Dion Decl. ¶ 10.  This medical review resulted in a determination that some services submitted were not reasonable and necessary, resulting in an overpayment of $239,067.97.  Id.  The McCunes were notified of this overpayment in December of 1999.  Id.

In 1996, Congress passed the Health Insurance Portability and Accountability Act ("HIPAA"), in part to "combat waste, fraud and abuse in health insurance."  PL 104-191 (HR 3103)(Aug. 21, 1996). HIPAA granted the Department of Justice the authority to issue administrative subpoenas to investigate health care fraud criminal cases, 18 U.S.C. § 3486.

The subpoenas that were issued in this case in January of 1999 were issued in the course of a criminal investigation into health care fraud.  Special Agent Melear testified that in fraud or white collar crime cases, including health care fraud, it is typical to issue a subpoena for financial records.  Melear Dep. 149:10-24.

AUSA Anderson testified that during the time in question, he did not believe that the Right to Financial Privacy Act applied to subpoenas issue under § 3486.  Anderson Dep. 15:18-16:1.  See also Melear Dep. 97:25-99-2.  In fact, in 2009, during a review of

17

administrative subpoenas issued under § 3486, it could not be determined if notice was issued in any of those cases.  Dowdy Dep. 75:21-77:10.  There were approximately twenty-three (23) subpoenas issued for the financial records of an individual during an eleven (11) year period in a number of cases, including the case involving Dr. McCune.  Dowdy Dep. 119:14-120:23.  All of these subpoenas were issued in the same manner.  Dr. McCune's case was not treated in any way differently.  Dowdy Dep. 127:19-128:1.  Thus, in 2009, the USAO determined that it would send a letter to each individual for which such a subpoena was issued.  The letter stated that it did not appear that notice was provided to them, but if notice was provided, the USAO asked that the individual provide a copy of such notice.  The letter also advised the individual of his/her rights under the Right to Financial Privacy Act.  <u>See</u> letters at Def. Ex. T (redacted by the defendant to protect the privacy of individuals not involved in this lawsuit).

On October 27, 2011, the plaintiff filed his Second Amended Complaint ("Complaint").  The Complaint asserts claims pursuant to the Right to Financial Privacy Act for (1) failure to provide notice of the issuance of subpoenas as required by Title 12, United States Code, Section 3405 (Complaint, ¶ 19); and (2) failing to provide certification as required by Title 12, United States Code, Section 3403(b) (Complaint, ¶ 31).  The Complaint also contains claims against the financial institutions, which have been

18

dismissed from this action by agreement of the parties.

The defendant moves for summary judgment on several grounds. Federal Rule of Civil Procedure 56 provides that summary judgment should issue where there is no genuine dispute of a material fact, and the moving party is entitled to judgment as a matter of law. McGarry v. University of Mississippi Medical Center, 2008 WL 3822447, at *2 (S.D. Miss. Aug. 12, 2008).  The Court follows the standard set forth in Fed.R.Civ.P. 56(c), as interpreted by the United States Supreme Court:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  After the moving party has met this initial burden, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Fed.R.Civ.P. 56(e), however, does not permit the nonmoving party to avoid summary judgment by resting on the pleadings, but "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.  Moreover, the mere existence of a

19

scintilla of evidence in support of the non-movant's position is insufficient; there must be evidence on which the jury could reasonable find for the non-movant.  <u>Anderson</u>, 477 U.S. at 251-52.

The defendant's first ground for summary judgment is that the statute of limitations has run on any claim Dr. McCune would have under the Right to Financial Privacy Act ("RFPA").  The defendant asserts that Dr. McCune was aware at least by January of 2003 that the DOJ had access to his personal financial records.  He was required to bring any action he had under the RFPA before January of 2006, but this action was not filed until July 13, 2011.

Any action under the RFPA must be filed "within three years from the date on which the violation occurs or the date of discovery of such violation, whichever is later."  12 U.S.C. § 3416.  "The date of discovery is not the date when plaintiff realizes he has a legal cause of action; rather, it is the date on which plaintiff becomes aware of the alleged injury."  <u>Giannone v. Bank of America</u>, 812 F.Supp.2d 216, 220-21 (E.D. N.Y. 2011)(citing <u>United States v. Kubrick</u>, 444 U.S. 111, 122 (1979)).  Because the RFPA represents a limited waiver of the United States' sovereign immunity, the statute of limitations contained therein must be "scrupulously followed."  <u>Raikos v. Bloomfield State Bank</u>, 703 F. Supp. 1365, 1367 (S.D. Ind. 1989).  Also, it is the plaintiff's burden to establish the facts supporting the allegation of jurisdictional facts by competent proof.  <u>Id</u>. at 1368.

20

In _Giannone_, the United States Secret Service had obtained the relevant financial information from the plaintiff's financial institution in 2005, but the plaintiff did not file suit until 2010.  812 F.Supp.2d at 221.  The court found that the plaintiff was barred by the statute of limitations from bringing a claim under the RFPA.  _Id_.  The plaintiff argued that he did not become aware of the inappropriate contact between the Secret Service and his bank until he received a letter informing him of the call between his bank and a Secret Service agent.  _Id_.  The court, however, determined that the plaintiff was aware of the facts surrounding the violation earlier when the Secret Service Agent testified that he learned of the plaintiff's name from the bank during a phone call.  _Id_.  The court found that "[f]or purposes of the statute of limitations, plaintiff was aware of the allegedly illicit exchange of information after this testimony, when considering the testimony in combination with other information that plaintiff was already made aware of during the course of the criminal prosecution."  _Id_. at 221-222.

The court in _Raikos_ reached a similar conclusion, rejecting the plaintiff's argument that he did not learn of the violation of the RFPA until February 1985.  703 F.Supp. at 1368.  The court found that the plaintiff's earlier sworn testimony indicated that he had learned of the informal disclosure of bank information during the criminal discovery process.  _Id_.  The court therefore

21

found that the plaintiff had discovered the violation seven (7) years before he actually filed his suit, and his action was time-barred.  Id.

The DOJ urges the Court to reach the same result in this case, and in support shows the following: Special Agent Melear states that she copied any bank records obtained for production to the defense during the criminal prosecution.  Melear Dep. 95:16-96:1. In addition, the grand jury issued a superseding indictment listing Dr. McCune's bank account information in January of 2003.  Thus, Dr. McCune knew that the DOJ had gained access to his bank records by at least January of 2003, and his cause of action is therefore time-barred.  Def. Memo., p. 18.

In response, the plaintiff points out that "discovery" for statute of limitations purposes occurs when a plaintiff knows both (1) that he or she has been injured; and (2) who inflicted the injury.  See Kubrick, 444 U.S. at 122.  The Supreme Court reasoned:

> That [a plaintiff] has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain.  The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury.  He is no longer at the mercy of the latter.

Id.  Dr. McCune contends that until he "received Assistant U.S. Attorney Scott Gilbert's letter dated May 7, 2009, he knew neither of these critical facts."  Pl. Memo., p. 3.

Although the DOJ alleges that Special Agent Melear provided

22

copies of "any bank records obtained" during Dr. McCune's criminal prosecution, and that the superseding grand jury indictment listed his bank account information, Dr. McCune insists that neither of these allegations establishes that he knew the DOJ obtained his personal financial information illegally.  Id.  The plaintiff also contends that his

> personal financial information could conceivably have been obtained by DOJ legally during the secret grand jury proceedings, without Dr. McCune's knowledge, instead of several years/months earlier by DOJ's illegal administrative subpoenas.  Because Dr. McCune's personal information could have been disclosed during the secret grand jury proceedings, and the only two facts alleged by DOJ refer to post-grand jury events, DOJ has alleged nothing that supports summary judgment based on the RFPA statute of limitations.  In the alternative, and at a minimum, there are genuine issues of material facts about Dr. McCune's knowledge that preclude summary judgment.

Id. at pp. 3-4.

In rebuttal, the DOJ shows that the plaintiff does not dispute that he actually knew the DOJ had access to his bank records in January of 2003.  Def. Rebuttal Memo., p. 2.  The defendant also points out that "[a]t a minimum, Plaintiff, through reasonable diligence, could have discovered all of the facts necessary to proceed on his cause of action in January 2003."  Id.

The plaintiff does not dispute that the Court must examine this issue in the context of the United States' waiver of sovereign immunity.  Where, as here, the United States has waived its sovereign immunity and allows suit for monetary damages, the waiver is limited, and the court must strictly construe it.  Raikos, 703

F. Supp. at 1367 (noting that statute of limitations for RFPA must be "scrupulously followed"); see also In re FEMA Trailer Formaldehyde Prods. Liability Litig., 646 F.3d 185, 191 (5th Cir. 2011)(noting "the jurisdictional nature of the FTCA's statute of limitations and the general policy of construing narrowly statutes that waive sovereign immunity").

Neither does the plaintiff dispute that he knew the DOJ had access to his financial records in January of 2003.  Inasmuch as the "injury" in this case would be disclosure of his financial records, the plaintiff knew of the injury.  Although it is not clear from his response, the plaintiff may be contending that his injury would be the closing of his business and his criminal trial. However, that would not be the injury.  The RFPA protects only against disclosure of financial records.  It is not a guarantor of one's business or protection from prosecution.  Thus, at most, the alleged closing of his business and criminal trial would be damages, not the injury protected by the RFPA.

The plaintiff also knew, or at the very least, through reasonable diligence, should have known, of the cause of his injury.  Dr. McCune attempts to avoid the statute of limitations by arguing that (1) the discovery rule does not apply in his case, and (2) even if it does apply, a reasonably diligent plaintiff would not have discovered the violations prior to May of 2009.

First, the plaintiff attempts to avoid his obligation under

the discovery rule by invoking Merck & Co., Inc. v. Reynolds, 559 U.S. 633 (2010).  He contends that Merck stands for the proposition that he has no obligation to inquire or investigate to determine whether he has a cause of action once he discovers his injury.  The plaintiff's reliance on Merck is misplaced.  First of all, the Supreme Court stated that its interpretation of the discovery rule in Merck was limited to the statute of limitations applicable to a securities fraud action under § 10(b) of the Securities Exchange Act of 1934.  Id. at 648 (noting that its holding was with respect to "'discovery' as used in this statute"); see also SEC v. Bartek, 484 Fed. Appx. 949, 954-55 (5th Cir. 2012)(noting that Merck is limited to its context).  Second, contrary to the plaintiff's argument, Merck does not stand for the proposition that the plaintiff does not need to make reasonable inquiry as a part of due diligence.  In fact, the Merck Court noted that "[i]n determining the time at which 'discovery' of those 'facts' occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify when facts would have prompted a reasonably diligent plaintiff to begin investigating." 559 U.S. at 653.

In this case, the Court finds that a reasonable person in Dr. McCune's position should have inquired into how the government obtained his financial records once he determined that the government in fact had his financial records.  Had the plaintiff

begun that investigation, or made that inquiry, he would have learned in short order that the government had issued administrative subpoenas. Furthermore, the plaintiff was represented by counsel, and could have easily learned the source of the bank records with one simple inquiry, or if need be, a motion before the court. Thus, the plaintiff's cause of action accrued no later than January of 2003 (or shortly thereafter) when he received the Superseding Indictment.

The plaintiff argues that his financial records could conceivably have been obtained by grand jury proceedings. While this statement is true, it is nevertheless pure supposition and speculation. The fact that the grand jury existed did not alleviate the plaintiff of his obligation of diligence. Certainly, had the plaintiff made the inquiry, the existence of the grand jury proceedings would not have shielded the use of administrative subpoenas in obtaining his financial records. In other words, the existence of grand jury proceedings would not have prevented the plaintiff from learning how the government obtained records not secured through the grand jury process. Furthermore, to the extent that the plaintiff contends his records were secured through the grand jury process and used therein, grand jury subpoenas are exempt from the RFPA. See 12 U.S.C. § 3413(i).

The plaintiff also contends, without pointing to any specific facts, that there are genuine issues of material fact as to whether

the statute of limitations has run.  However, the plaintiff cannot simply make a blanket assertion that issues of material facts exist; he must actually point to those material facts.  He appears to argue that the DOJ must come forward with affidavits and evidence demonstrating that no material fact exists as to the statute of limitations issue.  In this case, however, the statute of limitations is a jurisdictional prerequisite; therefore, the plaintiff, who has invoked the jurisdiction of this Court, bears the burden of establishing that his claim is timely.  See, e.g., Ramos v. United States, 112 Fed.Cl. 79, 83 (Fed.Cl. 2013)("When the government has asserted that a claim is barred by a jurisdictional statute of limitations, the plaintiff bears the burden of proving the timeliness of his suit.").  The plaintiff has put forth nothing but mere speculation.  He attempts to distinguish Giannone and Raikos by contending that those cases did not involve grand jury proceedings; however, both cases involved an indictment, and therefore grand jury proceedings.

The undisputed facts show that Dr. McCune had constructive notice of his claims by January of 2003.  His receipt from the DOJ of copies of his bank records, and the superseding indictment listing his bank account information were "red flags" which should have excited his suspicion and put him on notice of his claims. Furthermore, as an indicted defendant Dr. McCune had the ability to use the criminal discovery process to discover certain information

surrounding the DOJ's receipt of his financial records.  At that time, the plaintiff fully knew of his alleged injury.  He also should have discovered the factual basis for his cause of action, inasmuch as it was capable of detection by the exercise of reasonable diligence.  Because the plaintiff has not come forward with any evidence of an attempt to determine the readily-discoverable details of his claim, his action is barred by the statute of limitations.

The Court finds that the three-year statute of limitations under the RFPA bars the plaintiff's claims.  The Court further finds that it is unnecessary to reach the defendant's claim that the plaintiff cannot establish a causal connection between any alleged disclosure and the harm he claims, and the defendant's claim that the plaintiff is not entitled to punitive damages.  See Giannone, 812 F.Supp.2d at 228 n.10 (finding it unnecessary to reach arguments that the complaint was insufficiently pled, and that the complaint did not allege legally cognizable damages, because the plaintiff's claims were barred by the statute of limitations).  It also follows that the plaintiff's motion for summary judgment should be denied.

The Court therefore finds that the defendant's motion for summary judgment is well-taken.  Accordingly,

IT IS HEREBY ORDERED that the Motion for Summary Judgment **(docket entry 313)** filed by the defendants United States Department

28

of Justice and Office of the United States Attorney General for the Southern District of Mississippi is GRANTED;

FURTHER ORDERED that the plaintiff Frank B. McCune, Jr.'s Motion for Partial Summary Judgment **(docket entry 317)** is DENIED.

A final judgment dismissing all claims with prejudice shall follow.

SO ORDERED, this the 5th day of February, 2014.


/s/ David Bramlette
UNITED STATES DISTRICT JUDGE